CLIFFORD F. MacEVOY CO. ET AL. *v.* UNITED STATES FOR THE USE AND BENEFIT OF CALVIN TOMKINS CO.

No. 483.  Argued March 7, 1944.—Decided April 24, 1944.

*Mr. Edward F. Clark,* with whom *Messrs. Elmer O. Goodwin* and *John A. Shorten* were on the brief, for petitioners.

*Mr. Benjamin P. DeWitt* for respondent.

*Solicitor General Fahy, Assistant Attorney General Shea,* and *Messrs. Valentine Brookes* and *Melvin Richter* filed a brief on behalf of the United States, as *amicus curiae,* urging affirmance.

MR. JUSTICE MURPHY delivered the opinion of the Court.

The United States entered into a contract with the petitioner Clifford F. MacEvoy Company whereby the latter agreed to furnish the materials and to perform the work necessary for the construction of dwelling units of a Defense Housing Project near Linden, New Jersey, on a cost-plus-fixed-fee basis. Pursuant to the Miller Act,[1] MacEvoy as principal and the petitioner Aetna Casualty and Surety Company as surety executed a payment bond in the amount of $1,000,000, conditioned on the prompt payment by MacEvoy "to all persons supplying labor and material in the prosecution of the work provided for in said contract." The bond was duly accepted by the United States.

MacEvoy thereupon purchased from James H. Miller & Company certain building materials for use in the prosecution of the work provided for in MacEvoy's contract with the Government. Miller in turn purchased these materials from the respondent, Calvin Tomkins Company. Miller failed to pay Tomkins a balance of $12,033.49. There is no allegation that Miller agreed to perform or did perform any part of the work on the construction project.

---

[1] Act of August 24, 1935, c. 642, 49 Stat. 793; 40 U. S. C. § 270a *et seq.*

104

Nor is it disputed that MacEvoy paid Miller in full for the materials.

Within ninety days from the date on which Tomkins furnished the last of the materials to Miller, Tomkins gave written notice to MacEvoy and the surety of the existence and amount of Tomkins' claim for materials furnished to Miller. Tomkins as use-plaintiff then instituted this action against MacEvoy and the surety on the payment bond. The District Court granted petitioners' motion to dismiss the complaint for failure to state a claim against them. 49 F. Supp. 81. The Circuit Court of Appeals reversed the judgment. 137 F. 2d 565. We granted certiorari because of a novel and important question presented under the Miller Act. 320 U. S. 733.

Specifically the issue is whether under the Miller Act a person supplying materials to a materialman of a Government contractor and to whom an unpaid balance is due from the materialman can recover on the payment bond executed by the contractor. We hold that he cannot.

The Heard Act,[2] which was the predecessor of the Miller Act, required Government contractors to execute penal bonds for the benefit of "all persons supplying him or them with labor and materials in the prosecution of the work provided for in such contract." We consistently applied a liberal construction to that statute, noting that it was remedial in nature and that it clearly evidenced "the intention of Congress to protect those whose labor or material has contributed to the prosecution of the work." *United States* v. *American Surety Co.*, 200 U. S. 197, 204. See also *Mankin* v. *United States*, 215 U. S. 533; *U. S. Fidelity & Guaranty Co.* v. *Bartlett*, 231 U. S. 237; *Brogan* v. *National Surety Co.*, 246 U. S. 257; *Fleischmann Construction Co.* v. *United States*, 270 U. S. 349; *Standard*

_____

[2] Act of August 13, 1894, c. 280, 28 Stat. 278, as amended by Act of February 24, 1905, c. 778, 33 Stat. 811; 40 U. S. C. § 270.

*Accident Insurance Co.* v. *United States,* 302 U. S. 442. We accordingly held that the phrase "all persons supplying [the contractor] . . . with labor and materials" included not only those furnishing labor and materials directly to the prime contractor but also covered those who contributed labor and materials to subcontractors. *United States* v. *American Surety Co., supra,* 204; *Mankin* v. *United States, supra,* 539; *Illinois Surety Co.* v. *John Davis Co.,* 244 U. S. 376, 380. We had no occasion, however, to determine under that Act whether those who merely sold materials to materialmen, who in turn sold them to the prime contractors, were included within the phrase and hence entitled to recover on the penal bond.[3]

The Miller Act, while it repealed the Heard Act, reinstated its basic provisions and was designed primarily to eliminate certain procedural limitations on its beneficiaries.[4] There was no expressed purpose in the legis-

---

[3] In *United States* v. *American Surety Co.,* 200 U. S. 197, 204, we said, "There is no language in the statute nor in the bond which is therein authorized limiting the right of recovery to those who furnish material or labor directly to the contractor, but all persons supplying the contractor with labor or materials in the prosecution of the work provided for in the contract are to be protected. The source of the labor or material is not indicated or circumscribed. It is only required to be 'supplied' to the contractor in the prosecution of the work provided for." This broad language, which went beyond that required by the facts and the holding in that case, might seem to justify recovery by persons supplying materials to materialmen. Such was the holding in *Utah Construction Co.* v. *United States,* 15 F. 2d 21. Our denial of certiorari in that case, 273 U. S. 745, was not a determination by us of the issue, however. Compare *Continental Casualty Co.* v. *North American Cement Corp.,* 91 F. 2d 307, expressing the opposite opinion under an identical District of Columbia statute.

[4] Under the Heard Act, a single bond was required to protect both the Government and the suppliers of labor and materials. The Government was given the sole right to sue on the bond for six months after completion of the work and final settlement. Other claimants could sue only thereafter and had to join in a single action. Serious

lative history to restrict in any way the coverage of the Heard Act; the intent rather was to remove the procedural difficulties found to exist under the earlier measure and thereby make it easier for unpaid creditors to realize the benefits of the bond. Section 1 (a) (2) of the Miller Act requires every Government contractor, where the amount of the contract exceeds $2,000, to furnish to the United States a payment bond with a surety "for the protection of all persons supplying labor and material in the prosecution of the work provided for in said contract for the use of each such person." Section 2 (a) further provides that "every person who has furnished labor or material in the prosecution of the work provided for in such contract" and who has not been paid in full therefor within ninety days after the last labor was performed or material supplied may bring suit on the payment bond for the unpaid balance. A proviso then states:

"*Provided, however,* That any person having direct contractual relationship with a subcontractor but no contractual relationship express or implied with the contractor furnishing said payment bond shall have a right of action upon the said payment bond upon giving written notice to said contractor within ninety days from the date on which such person did or performed the last of the labor

inconveniences and delays resulted. The claimants, often in need of immediate funds, were compelled to settle meritorious claims for less than the full amount. The Miller Act was designed to meet these difficulties by requiring that the prime contractor execute two bonds— a performance bond to protect the Government and a payment bond to protect the creditors. Creditors can sue on the latter bond without waiting for the Government and even without waiting for completion of the project. Each creditor may sue separately ninety days after the labor is completely performed or materials fully supplied. Hearings on H. R. 2068, et al., Bonds of Contractors on Public Works, House Committee on the Judiciary, 74th Cong., 1st Sess.; 79 Cong. Rec. 11702, 13382; H. Rep. No. 1263 and S. Rep. No. 1238 (74th Cong., 1st Sess.).

or furnished or supplied the last of the material for which such claim is made. . . ."

The Miller Act, like the Heard Act, is highly remedial in nature. It is entitled to a liberal construction and application in order properly to effectuate the Congressional intent to protect those whose labor and materials go into public projects. *Fleisher Engineering Co.* v. *United States,* 311 U. S. 15, 17, 18; cf. *United States* v. *Irwin,* 316 U. S. 23, 29, 30. But such a salutary policy does not justify ignoring plain words of limitation and imposing wholesale liability on payment bonds. Ostensibly the payment bond is for the protection of "all persons supplying labor and material in the prosecution of the work" and "every person who has furnished labor or material in the prosecution of the work" is given the right to sue on such payment bond. Whether this statutory language is broad enough to include persons supplying material to materialmen as well as those in more remote relationships we need not decide. Even if it did include such persons we cannot disregard the limitations on liability which Congress intended to impose and did impose in the proviso of § 2 (a). However inclusive may be the general language of a statute, it "will not be held to apply to a matter specifically dealt with in another part of the same enactment. . . . Specific terms prevail over the general in the same or another statute which otherwise might be controlling." *Ginsberg & Sons* v. *Popkin,* 285 U. S. 204, 208.

The proviso of § 2 (a), which had no counterpart in the Heard Act, makes clear that the right to bring suit on a payment bond is limited to (1) those materialmen, laborers and subcontractors who deal directly with the prime contractor and (2) those materialmen, laborers and sub-subcontractors who, lacking express or implied contractual relationship with the prime contractor, have direct contractual relationship with a subcontractor and who give

the statutory notice of their claims to the prime contractor. To allow those in more remote relationships to recover on the bond would be contrary to the clear language of the proviso and to the expressed will of the framers of the Act.[5]   Moreover, it would lead to the absurd result of requiring notice from persons in direct contractual relationship with a subcontractor but not from more remote claimants.

The ultimate question in this case, therefore, is whether Miller, the materialman to whom Tomkins sold the goods and who in turn supplied them to MacEvoy, was a subcontractor within the meaning of the proviso.   If he was, Tomkins' direct contractual relationship with him enables Tomkins to recover on MacEvoy's payment bond.   If Miller was not a subcontractor, Tomkins stands in too remote a relationship to secure the benefits of the bond.

The Miller Act itself makes no attempt to define the word "subcontractor."   We are thus forced to utilize ordinary judicial tools of definition.   Whether the word includes laborers and materialmen is not subject to easy solution, for the word has no single exact meaning.[6]   In a broad, generic sense a subcontractor includes anyone who has a contract to furnish labor or material to the prime contractor.   In that sense Miller was a subcontractor.   But under the more technical meaning, as established by usage

---

[5] "A sub-subcontractor may avail himself of the protection of the bond by giving written notice to the contractor, but that is as far as the bill goes.   It is not felt that more remote relationships ought to come within the purview of the bond." H. Rep. No. 1263 (74th Cong., 1st Sess.), p. 3.

[6] In analogous situations, state and lower federal courts have expressed divergent opinions as to whether the word "subcontractor" includes laborers and materialmen.   See annotation in 141 A. L. R. 321 for a summary of the conflicting cases.   We have not heretofore had occasion to define the word in this connection.   Any loose, interchangeable use of "subcontractor" and "materialman" in any prior decision of ours is without significance.

in the building trades, a subcontractor is one who performs for and takes from the prime contractor a specific part of the labor or material requirements of the original contract, thus excluding ordinary laborers and materialmen. To determine which meaning Congress attached to the word in the Miller Act, we must look to the Congressional history of the statute as well as to the practical considerations underlying the Act.

It is apparent from the hearings before the subcommittee of the House Committee on the Judiciary leading to the adoption of the Miller Act that the participants had in mind a clear distinction between subcontractors and materialmen. In opening the hearings, Representative Miller, the sponsor of the bill that became the Miller Act, stated in connection with the various proposed bills that "we would like to have the reaction and opinion of members in reference to those bills that deal with the general subject of requiring a bond for the benefit of laborers and materialmen who deal with subcontractors on public works." [7] And the authoritative committee report [8] made numerous references to and distinguished among "laborers, materialmen and subcontractors." Similar uncontradicted statements were made in both houses of Congress when the Act was pending before them.[9] The fact that

---

[7] Hearings on H. R. 2068, et al., Bonds of Contractors on Public Works, House Committee on the Judiciary, 74th Cong., 1st Sess., p. 1. See also statements by Rep. Miller, *id.*, pp. 18, 26, 60, 67, 74; Rep. Robsion, p. 30; Rep. McLaughlin, p. 73; Rep. Dockweiler, pp. 12–22; Rep. Celler, pp. 83, 84, 89; Edward H. Cushman, pp. 23–31, 85.

[8] H. Rep. No. 1263 (74th Cong., 1st Sess.), pp. 1, 2.

[9] Rep. Miller stated in the House that "This bill merely provides that in the construction of public buildings and other public works there shall be two bonds, one for the performance of the contract with the Government, and the other a payment bond for the protection of subcontractors and those furnishing the labor and material. Under the present law we have but one bond, with a dual obligation, but it is not satisfactory in that it does not afford protection to the

subcontractors were so consistently distinguished from materialmen and laborers in the course of the formation of the Act is persuasive evidence that the word "subcontractor" was used in the proviso of § 2 (a) in its technical sense so as to exclude materialmen and laborers.[10]

Practical considerations underlying the Act likewise support this conclusion. Congress cannot be presumed, in the absence of express statutory language, to have intended to impose liability on the payment bond in situations where it is difficult or impossible for the prime contractor to protect himself. The relatively few subcontractors who perform part of the original contract represent in a sense the prime contractor and are well known to him. It is easy for the prime contractor to secure himself against loss by requiring the subcontractors to give security by bond, or otherwise, for the payment of those who contract directly with the subcontractors. *United States* v. *American Surety Co., supra,* 204; *Mankin* v. *United States, supra,* 540. But this method of protection is generally inadequate to cope with remote and undeterminable liabilities incurred by an ordinary materialman, who may be a manufacturer, a wholesaler or a retailer.[11] Many such materialmen are usually involved in large

subcontractors, materialmen, and laborers. This merely provides for two bonds, one for the protection of the Government's interests, and the other for the protection of the rights of labor, the subcontractors, and material furnishers." 79 Cong. Rec. 11702.

Sen. Burke said in the Senate that "This bill would amend that law by requiring an additional bond, a payment bond, for the protection of materialmen and laborers, subcontractors, and all who put forth their labor or furnish materials or incur expenditures in connection with the work." 79 Cong. Rec. 13382.

[10] See, in general, Campbell, "The Protection of Laborers and Materialmen Under Construction Bonds," 3 Univ. of Chicago L. Rev. 1; Annotation, 77 A. L. R. 21.

[11] See Note, "The Widening Scope of Protection of Statutory Construction Bonds," 45 Harvard L. Rev. 1236.

projects; they deal in turn with innumerable sub-materialmen and laborers. To impose unlimited liability under the payment bond to those sub-materialmen and laborers is to create a precarious and perilous risk on the prime contractor and his surety. To sanction such a risk requires clear language in the statute and in the bond so as to leave no alternative.[12] Here the proviso of § 2 (a) of the Act forbids the imposition of such a risk, thereby foreclosing Tomkins' right to sue on the payment bond.

The judgment of the court below is

*Reversed.*

---

[12] Congress has shown its ability in other statutes to make clear an intent to include materialmen within the meaning of the word "subcontractor." See § 301 (a) (3) of the Act of Dec. 2, 1942, 56 Stat. 1035, 42 U. S. C. Supp. II, § 1651 (a) (3), providing that the provisions of the Act shall not apply to employees of a "subcontractor who is engaged exclusively in furnishing materials or supplies." In other statutes, Congress has clearly used the term "subcontractor" in contrast to "materialman." See 40 U. S. C. § 407 (b); 41 U. S. C. § 10b (a) and (b); 41 U. S. C. § 28.